```
UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF RHODE ISLAND
- - - - - - - - - - - - - - - - - -x

In re:                                :

DEBORAH A. LIMA                       :     BK No. 11-10057
              Debtor                        Chapter 13
- - - - - - - - - - - - - - - - - -x
DEBORAH A. LIMA                       :
              Plaintiff
v.                                    :     A.P. No. 11-1010

GLEN CONLON                           :
JOHN JEANNETTI
WABAN MORTGAGE COMPANY, LLC           :
              Defendants

- - - - - - - - - - - - - - - - - -x
```

<u>**FINDINGS OF FACT, CONCLUSIONS OF LAW, AND**</u>
<u>**JUDGMENT AGAINST ALL DEFENDANTS**</u>

**APPEARANCES:**
     Jeffrey Dana, Esq.
     Attorney for Plaintiff
     Family Law Center of Rhode Island, P.C.
     38 Bellevue Avenue, Suite G
     Newport, Rhode Island 02840

     Robert M. Sabel, Esq.
     Attorney for Plaintiff
     Rhode Island Legal Services
     50 Washington Square
     Newport, Rhode Island 02840

     Michael F. Drywa, Esq.
     Attorney for Defendants Conlon and Jeannetti
     Sims & Sims, LLP
     53 Arlington Street
     Brockton, Massachusetts 02303

     Jeffrey J. Cymrot, Esq.
     Attorney for Waban Mortgage Co.,LLC
     Sasson & Cymrot, LLP
     84 State Street, 8th Floor
     Boston, Massachusetts 02109

**BEFORE ARTHUR N. VOTOLATO, United States Bankruptcy Judge**

BK No. 11-10057; A.P. No. 11-1010

Heard on the Debtor Deborah Lima's ("Lima") multi-count complaint to undo a purported conveyance of her home ("the property") to Defendant Glen Conlon, and to recover money from Defendants John Jeannetti and Conlon.  Lima asserts theories of fraud (Count 1), constructive trust (Count 2), and equitable mortgage (Count 3) against Conlon who supplied the borrowing power, and Jeannetti, a mortgage broker, who masterminded the activities that are the subject of this dispute.  Lima also alleged violations of the Federal Truth in Lending Act (Count 5), and Rhode Island usury law (Count 6), but presented no evidence concerning those counts, so they are deemed waived.[1]  In essence, Lima's position is that she engaged Jeannetti for the narrow purpose of preventing the sale of her house at foreclosure,[2] but that once she signed on with them, they embarked on a clandestine pattern of equity skimming by repeatedly refinancing the property, and virtually stealing the proceeds.  The Defendants deny the allegations, and argue, almost humorously and with no factual or legal support, that somehow they are the victims of Lima in this audacious scenario.

---

[1]   In their Answers Conlon and Jeannetti each asserted a counterclaim for abuse of process against Lima, but presented no evidence on the subject.  Therefore, those counterclaims are also waived.

[2]   While title to the property has at all relevant times been in Conlon's name, Jeannetti and Conlon acted in concert, with Jeannetti clearly in charge of the enterprise.

1

BK No. 11-10057; AP No. 11-1010

Count 7 of the complaint is aimed solely at Waban Mortgage Company LLC, with Lima contending that Waban is not a bona fide mortgagee, and she seeks to avoid the mortgage on the ground that Waban was or should have been aware of Lima's claimed equitable interest in the property. Waban denies Lima's allegations, and asserts a cross-claim against Conlon for the balance due on Conlon's obligation.

## FINDINGS AND CONCLUSIONS

At trial the witnesses were Lima, Conlon, Jeanetti, and Robert Brown, the principal of Waban Mortgage. After an extensive and acrimonious hearing, and based on the testimony, the undisputed facts in the Joint Pre-trial Order ("JPTO"), the exhibits, and pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure, I make the following findings of fact and conclusions of law.

1.   Lima inherited the property from her mother via an Executor's Deed, Ex. A, dated January 4, 2006. At that time the property, worth $300,000, was unencumbered.

2.   Before long, however, with no cash, only a modest earning capacity, unable to manage her financial affairs, but clearly in need of a new furnace and a car, Lima obtained a home equity loan from CitiFinancial, Ex. B, in the amount of $15,991. Lima defaulted on the loan, and she received a timely notice from

2

BK No. 11-10057; AP No. 11-1010

CitiFinancial's attorneys that a foreclosure sale would take place on October 9, 2008.  At that time, there was substantial equity in the property.

3.   Unsure as to how to deal with the pending CitiFinancial foreclosure, Lima contacted Jeannetti for the purpose of devising a way to save the property.  Shortly after his retention, Jeannetti reported that he was unable to obtain conventional financing in Lima's name because of her lack of creditworthiness.  That, at least, is what he reported to Lima.[3]

4.   As an alternative to re-financing in Lima's name, Jeannetti's next idea was to propose a plan wherein Lima would transfer title to her property to a person (Conlon) who had sufficient credit to obtain a new loan in his name, and pay off the CitiFinancial mortgage.  Under this "arrangement," the grantee (Conlon) would pay nothing to Lima, who would be responsible for all expenses of servicing the new mortgage, would thereby establish her own credit history, and then re-acquire her title to the house.

5.   Lima agreed to Jeannetti's proposal, and Conlon and Lima executed a document (prepared by Jeannetti) styled "Agreement between the 2 owners" of the property, see Ex. E, wherein Lima

---

[3] Credibility questions on all relevant issues of fact herein are resolved against Jeannetti and Conlon.

BK No. 11-10057; AP No. 11-1010

transferred the title to her house to Conlon, who promptly applied for and obtained a new loan in his name from Fairfield Financial Mortgage Company, and paid off CitiFinancial. *The Agreement contains no provision, or authorization by Lima, for refinancing, and none is implied*. Although Jeannetti is not a signatory to this agreement, he drafted and directed the entire transaction as Conlon's de facto partner.

6. Lima and Conlon also signed a separate "Standard Form Purchase & Sale Agreement," Ex. D, also prepared by Jeannetti, which contained a "mortgage contingency clause," in the amount of $60,000, but with a "purchase price" of $75,000. The additional $15,000 was described (but unexplained) as a "20% gift of equity" from Lima to Conlon.

7. On October 3, 2008, based on a loan application prepared by Jeannetti, Conlon obtained financing from Fairfield in the amount of $60,000, and a mortgage to MERS, Ex. O, which contained a covenant, ¶5, that the borrower (Conlon) intended to occupy the premises as his principal residence, and that it is an act of default for the borrower to misrepresent his residency intention. On October 6, 2008, Lima executed a warranty deed conveying the property to Conlon, Ex. F. From the proceeds of this financing: (a) $4,900 in closing costs were paid; (b) CitiFinancial was paid

4

BK No. 11-10057; AP No. 11-1010

$15,547, satisfying and discharging its mortgage; and (c) $935 in delinquent real estate taxes were paid.  See JPTO ¶¶21,22,23.

8.  The net proceeds of $38,347 were immediately delivered by Lima to Conlon and Jeannetti.  Conlon deducted $3,000[4] he had advanced to CitiFinancial's attorneys, and he and Jeannetti retained the balance of over $35,000.  Lima received no cash but was told by Jeannetti that her outstanding credit card bills would be paid, and that "a reserve account would be established with some of the remaining funds."

9.  Lima was not represented by an attorney or other professional at any time during this business relationship, she relied exclusively on Jeannetti for advice, and was not informed and did not receive notice of, or participate in any subsequent borrowings after the Fairfield refinancing.

10.  Lima paid Conlon $642[5] per month for the period November 1, 2008 through June 30, 2010, totaling $12,440.

---

[4] Conlon had borrowed this amount from a cousin.

[5] These payments covered principal and interest on the Fairfield mortgage, escrow for taxes, and insurance.

5

BK No. 11-10057; AP No. 11-1010

11.   On November 2, 2009, Conlon refinanced the property again, obtained an FHA insured mortgage from Bank of America[6] ("BoA"), and paid off the Fairfield mortgage.   After the fact, Jeannetti informed Lima, without further details, that the purpose of this refinancing was "to obtain a better interest rate."  Conlon received $10,819, which he shared with Jeannetti.  Lima was current on her obligation to Conlon at that time.

12.   On May 24, 2010, Conlon again refinanced the property with Bank of America, netting $14,993.  Lima, who was current with Conlon at that time as well, was not informed of the transaction until after it was completed, and she received none of the proceeds of the refinancing.

13.   The Bank of America mortgages contain covenants, ¶5, Ex. Q, and ¶¶6,8, Ex. S, that the mortgaged property was Conlon's principal residence.   Each of these misrepresentations concerning residency is a separate event of default, which Conlon repeated in his 2009 Federal Tax Return.

14.   Jeannetti prepared the loan applications, on Conlon's behalf, for each refinancing with Bank of America.

---

[6] Bank of America is not a party to this litigation, it has not participated in any way, and nothing herein is intended to affect the status of its mortgage.

6

BK No. 11-10057; AP No. 11-1010

15.   On July 9, 2010, at Jeannetti's direction, Conlon obtained a second mortgage from Waban in the amount of $40,000, he received net cash of $33,025, and did not inform Lima of this transaction either.   In his loan application process with Waban, Conlon represented for the first time that he did not reside at the property.

16.   Since their initial financing with Fairfield, and in subsequent borrowings from Bank of America and Waban, Conlon and Jeannetti received $93,838.   Lima received none of the cash from these transactions, and none of the proceeds were used for the maintenance or benefit of the property.

17.   Based on Jeannetti's representations to her,[7] Lima understood that the amount necessary to re-acquire title to the property would be approximately the costs and fees associated with the Fairfield mortgage, i.e., $60,000.

18.   Eventually, at the urging of friends, Lima involved William Rego, a "middleman," who inquired on her behalf about reacquiring title to the property.   In an undated letter, Ex. K, Conlon responded to Rego suggesting a price of $220,000 or, in the alternative, an open market sale through a realtor, wherein he

---

[7]   Made in the context of obtaining her assent to the Agreement, Ex. E, between Conlon and Lima.

7

BK No. 11-10057; AP No. 11-1010

(Conlon) "would be willing to share with you [Lima] heavily on the profit side." How the $220,000 figure was calculated is not explained.  Lima did not respond to Conlon's letter.  Later, Rego supposedly negotiated "a lower price," which became irrelevant when he (Rego) failed to attend that scheduled closing.

19.  Lima has made no mortgage payments since late May 2010, for June 2010.

20. Contrary to the aggressive and derogatory characterization of Lima by Defendants' counsel,[8] she was (and still is) unsophisticated, uneducated, deals with bad news by ignoring it, and was, naively and hopelessly, in over her head as soon as she became involved with these gentlemen. Her vulnerability to financial predators is evident in her willingness to make this Agreement to get herself out of a $15,000 dilemma, while she owned nearly $300,000 of equity in her house.  Even a modicum of due diligence should have led Lima to more ethical financial advisors than where she ended up.

21.  In August 2010, Conlon served Lima with notice to vacate the house by October 1, 2010. Ex. L.  When she failed to leave the

---

[8]  Mr. Drywa has made the ludicrous argument that somehow his clients had been duped by Lima, and that Conlon and Jeannetti were in fact the victims in this business relationship.

BK No. 11-10057; AP No. 11-1010

property, Conlon promptly started eviction proceedings as the alleged owner of the property, Ex. M, and Lima filed a Chapter 7 case.[9]  In addition to his status as a co-defendant with Jeannetti, Conlon is also here as the movant seeking relief from stay to evict Lima.

## DISCUSSION

### I.  EQUITABLE MORTGAGE, OR FEE SIMPLE TRANSFER OF TITLE?

Lima's main argument is that although it has some of the earmarks of a sale, this transaction, falls within the parameters of the doctrine rendering it an equitable mortgage.  According to Lima,[10] she transferred the title to her house to Conlon solely to prevent a foreclosure by CitiFinancial, with the deed serving only as a Jeannetti-inspired interim device to pay and discharge the CitiFinancial mortgage, and was under no circumstances ever intended to be an unconditional transfer of her house to Conlon.

Rhode Island, which recognizes the doctrine of equitable mortgage, allows a party to show that "a conveyance of real estate, although absolute on its face, was intended as collateral for the payment of a debt and was in fact a mortgage," *Boudreau v. Holzer*,

---

[9]  The case was converted to Chapter 13 on March 10, 2011.

[10]  And the facts and the law support her position.

9

BK No. 11-10057; AP No. 11-1010

109 R.I. 81, 85, 280 A.2d 88 (1971), and the intent of the parties to such agreements may be shown by parol evidence. *Id*. In examining intent, Rhode Island courts have considered, among other factors: (a) the market value of the property compared with the consideration paid; and (b) the motivation and the circumstances of the transferor, i.e., "'poverty, inexperience and pressing financial conditions.'" *Boudreau*, *supra* at 84-85. *See also, Boiani v. Wilson*, 47 R.I. 317 (1926) (lack of business experience of the seller, and inadequacy of consideration are matters of interest to a court of equity). Other factors considered by courts addressing equitable mortgage issues include: Continued possession by the homeowner, *In re Cox*, 493 F.3d 1336, 1342-1343 (11th Cir. 2007), and the reasonable belief by the homeowner that he/she retained the right to re-acquire the title to the property, *In re Cox,* at 1342; *In re O'Brien*, 423 B.R. 477, 491 (D.N.J. 2010).

Exhibit E, the (undated) "Agreement" drafted by Jeannetti sets out, in *his* words, the deal between Lima and Conlon. It begins: "Agreement between 2 owners of property located At 37 South Shore Rd Little Compton RI" and identifies the "owner[s] being Glen Conlon ... [and] ... Deborah Lima." It provides that: (a) *the purpose of the conveyance is to stop a foreclosure (by CitiFinancial)*; (b) Conlon's interest in the property will last for

10

BK No. 11-10057; AP No. 11-1010

two years (with the possibility that the contract could be extended
to a total of four years from October 1, 2008, but that after four
years the property could be sold and the profits divided); (c) Lima
retained the right to "re-acquire" the property; (d) Lima was
obligated to make monthly mortgage payments, (but that if she were
more than thirty days late, the property would be sold and profits
evenly divided); and (f) for his participation in this arrangement,
Conlon's fee is $10,000 per year, up to a maximum of $40,000. In a
handwritten amendment (for no apparent consideration) Lima assumed
the obligation to pay "any and all repairs" to the property.  This
provision was added at Jeannetti's direction, during the execution
of the Agreement.

The terms of this Agreement, as confirmed by the conduct of
the parties, is completely inconsistent, and at odds with the
Defendants' conclusory argument that Lima's intent was to convey
all of her interest, unconditionally, to Conlon.  The Agreement
requires Lima to make *mortgage payments*, and that Conlon be
compensated for his participation at the rate of $10,000 per year.[11]
This Court is satisfied that the Agreement was intended to
establish a temporary, though very expensive, "save the property"

---

[11]   Conlon testified that under a separate agreement he and
Jeannetti would share that money.

BK No. 11-10057; AP No. 11-1010

relationship, and not a one time conveyance of Lima's property to Conlon. Most importantly, the Agreement does not even refer to a purchase price, an indispensable element of a sale of real estate. *Greensleeves, Inc. v. Smiley*, 694 A.2d 714,716( R.I. 1997).

Lima made, and Conlon accepted mortgage payments under the Agreement, and that practice stopped only when Lima belatedly woke up to the mischief that Conlon and Jeannetti were perpetrating. Because the relevant documents were drafted by Jeannetti, all inconsistences or ambiguities are construed against him as Conlon's agent, and thus against Conlon. *See Fryzel v.Domestic Credit Corporation*, 120 R.I. 92, 385 A.2d 663 (1978).  And although the Purchase and Sale agreement contains boilerplate recitations about price and other conditions, its only purpose was to complete the loan application package required by the lender, Fairfield, and has nothing to do with the parties' Agreement.

The Rhode Island test to determine if a transaction is an equitable mortgage rather than an absolute conveyance, is easily satisfied in the blatant circumstances of this case, i.e., Conlon and Jeannetti illegally advanced to themselves over $93,000 of equity in the property, $50,000 of which was not part of the Agreement.  Behavior of this magnitude amounts at least to unjust enrichment, if not outright conversion by these Defendants.

12

BK No. 11-10057; AP No. 11-1010

Based on the totality of the circumstances in this dispute, which was throughly and hotly litigated, I conclude: that (1) the transaction between Lima and Conlon is not an absolute transfer of title to the property – and that judgment should enter for Lima on Count 3 of her Amended Complaint;[12] (2) Conlon and Jeannetti are entitled to the compensation provided for in the Agreement, i.e, $40,000, but no more; (3) the deed to Conlon is declared **VOID**; (4) Conlon and Jeannetti are jointly and severally liable to Lima in the amount of $53,838 plus interest at the judgment rate, and costs; and (5) Conlon's Motion for Relief from Stay is **DENIED, with prejudice**.

## II. <u>THE WABAN MORTGAGE</u>

A *bona fide* purchaser ("BFP") is one who purchases for value, in good faith, and without knowledge of adverse claims. *Shappy v. Downcity Capital Partners, Ltd., et. al.,* 973 A.2d 40, 44 (R.I. 2009), citing *Fleckhamer v. Fleckhamer,* 147 A. 886,888 (R.I. 1929). The first and second BFP elements are not disputed issues. Waban gave value ($40,000), and no clear evidence of bad faith was offered. The question whether Waban is entitled to BFP status, and

---

[12] Decision for Lima on Count 3 of the complaint effectively moots Count 1 (common law fraud), and Count 2 (constructive trust).

BK No. 11-10057; AP No. 11-1010

thus whether it has a valid mortgage, depends upon what if any notice it had of Lima's adverse claim to the property.[13]

While superficially it is arguable that Waban did not have actual notice of Lima's claim, under Rhode Island law Waban is charged with constructive notice of "all properly recorded claims" inferred from the record, including "the contents of instruments and other matters so recorded." *In re Barnacle,* 623 A.2d 445, 447 (R.I. 1993); R.I. Gen. L. § 34-13-2.  The Rhode Island recording statute defines the content of instruments to include "covenants, conditions, agreements and powers therein contained."  R.I. Gen. L. § 34-13-1.  It is not sufficient to merely note the existence of prior mortgages, and Rhode Island courts give "the broadest possible effect to constructive notice."  *Speedy Muffler King, Inc. v. Flanders,* 480 A. 2d 413, 415 (R.I. 1984).  What is required to establish constructive notice is a "definite and tangible clue"

---

[13]   Waban's cross-claim is brought under Fed. R. Bankr. P. 7013(f) since it arises out of the same transaction as the instant proceeding, and no party has questioned the Court's jurisdiction under *Stern v. Marshall*, 564 U.S. __, 131 S.Ct. 2594 ___(2011), or under any other theory.  Even the *Stern* majority pointed out that the question it decided was a "'narrow' one" affecting only "one isolated" aspect of the 1984 amendments.  Id.  Since the cross-claim is clearly tied to, and dependent upon Lima's challenge to Waban's status as a BFP, this Court was required to hear and decide that issue in order to fashion a complete remedy, including the preservation of Waban's claim against Conlon.  Accordingly, this Court does not feel it has encroached on any Article III territory.

14

BK No. 11-10057; AP No. 11-1010

such that "[a] reasonable title searcher ... would be placed upon notice to inquire further concerning the validity of the instrument." *In re Barnacle,* 623 A.2d at 449.

Waban inaccurately argues that the "only clue" in the Lima/Conlon dealings was the prior mortgage covenant in which Conlon declared his intention to reside at the South Shore Road property. In its Post-Trial Memorandum, Waban argues that because that agreement (Ex. E) was not recorded, there was no reason to investigate further, and absent such a duty, it (Waban) cannot be charged with knowledge of facts which a reasonable inquiry would have disclosed. Quite to the contrary, and given the outrageous activities of these Defendants, such a hyper-technical argument, in a constructive notice context, falls on virtually deaf ears. Further, Waban's own actions belie its BFP argument, i.e., Waban *did in fact* investigate the question raised by the prior mortgage covenant. Whether it was curious about the covenant or by the address listed on Conlon's 2009 tax return, Waban did obtain an affidavit from Conlon swearing that he did not reside at South Shore Road. Then, to its discredit, Conlon's misrepresentation to the IRS and Bank of America was apparently not of concern to Waban, once it had a facially sufficient affidavit in its file. A more meaningful inquiry, given the glaring inconsistency of residence,

15

BK No. 11-10057; AP No. 11-1010

would have been to inquire of the actual resident of the property,
i.e., Ms. Lima.  Instead of doing a straightforward investigation
to determine who occupied the property, Waban chose to rest on
Conlon's self-serving affidavit.  This is more CYA than BFP
behavior.

Assuming, arguendo only, that its alleged due diligence was
sufficient as to the residence issue, Waban incorrectly states that
Conlon's misrepresentation about his residence was the *only* clue
regarding an adverse claim by Lima.  Not so.  The evidence clearly
establishes that Waban, through its agent, Robert Brown, had actual
notice that the deed from Lima to Conlon recited a sale price of
$75,000, for a property worth nearly four times that amount.  This
alleged sale for such strikingly inadequate consideration
absolutely requires clarification as to what was really going on
with these parties.  Waban also had actual notice that Lima still
occupied the property, i.e., in a letter to Brown, Conlon states
that he rents the house to "Debra (sic) Lima", Plaintiff's Exhibit
B to Plaintiff's Opposition to Summary Judgment, and Brown received
notice by email from Jeannetti that the "tenant" at South Shore
Road was the former owner. *Id.* If actual knowledge that (1) the
former owner conveyed the property for clearly inadequate
consideration and (2) then remained in possession were not

16

BK No. 11-10057; AP No. 11-1010

sufficient to raise eyebrows, then Jeannetti's (successful) efforts to prevent an interior inspection should have triggered the obligation of further inquiry. *Id.* As Brown said to Jeannetti, "I get nervous when someone wants to restrict my access, or my information." *Id. See In re Ryan,* 851 F.2d 502, 507 (1st Cir. 1988). When the party in possession is the same person who transferred the property for far less than its actual value, a reasonable title searcher should be on notice of a potentially adverse claim to the property. Given all of these obvious red flags, the argument that Waban was a bona fide purchaser loses all credibility.

The conclusion that Waban had constructive notice of Lima's adverse claim is inescapable, as is the fact that Brown chose to disregard every clue. BFP status cannot be achieved by one who, out of haste to close a high-yield loan, opts not to inquire. For all the foregoing reasons, Waban is not a Bona Fide Purchaser and its mortgage on the subject property is declared void.

**III. <u>CONLON & THE WABAN MORTGAGE</u>**

Waban has filed a cross-claim against Conlon on the promissory note which was secured by its (now invalid) mortgage on the property. See footnote 13, supra. Brown testified that the note is in default, and Conlon offered no evidence to refute Waban's

17

BK No. 11-10057; AP No. 11-1010

position.  Therefore judgment should enter for Waban against Conlon on its cross-claim for principal and interest, notwithstanding this Court's Order invalidating Waban's mortgage.

### CONCLUSION

Based upon an admittedly hyper-intensive consideration of the details and facts in this proceeding, the transaction between Lima and Conlon, as put together and implemented by Jeannetti, did not constitute an absolute conveyance of Lima's ownership interest in the property.  To the contrary, its *only* purpose was to stave off an imminent foreclosure by CitiFinancial for a debt that amounted to a fraction (about 5%) of the value of the property.  Lima reserved the right to retain her home, and to preserve its huge equity, by paying Conlon and Jeannetti for their services in solving an immediate financial crisis, and these men have been paid handsomely for that part of their involvement, as they greedily swept most of their entire entitlement, $35,000, right up front, from the proceeds of the Fairfield mortgage.  Thereafter, however, they went completely over the top, going far beyond the terms of the Agreement.  I.e., the subsequent mortgages to Bank of America and Waban were not authorized, and were not required for any legitimate purpose under the Agreement.  Lima was timely paying the amount due under the Agreement and pursuant to the Fairfield

18

BK No. 11-10057; AP No. 11-1010

mortgage, while Conlon and Jeannetti took nearly 90% of their future but unearned entitlement under the Agreement, on the same day that the Fairfield mortgage closed. In a nutshell, the Defendants' blatant and unauthorized burdening of the property with additional mortgage debt unjustly enriched only them, it clearly exposes Jeannetti and Conlon as predators and classic scam artists, and renders the transfer of title a nullity.

Accordingly: (1) Judgment should enter for Lima as requested in Count 3 of her amended complaint; (2) Conlon and Jeannetti are **ORDERED** to pay Lima $53,838[14] which they pocketed for themselves from the unauthorized refinancings; and (3) (as housekeeping) Conlon's Motion for Relief from Stay is **DENIED**.

Waban Mortgage, which ignored all of the obvious indicia of Lima's interest, was on constructive notice of Lima's claim, and that notice defeats the contention that Waban is a *bona fide* purchaser. Therefore: (1) Judgment should enter for Lima on Count 7 of her amended complaint; (2) Waban's mortgage is declared **VOID**;

---

[14] The amount is determined by deducting the amount to which Conlon and Jeannetti were entitled under the agreement ($40,000), from the total that they unlawfully extracted from the equity ($93,838).

19

BK No. 11-10057; AP No. 11-1010

and finally, (3) Judgment should enter for Waban on its cross-claim

against Conlon.

      Enter.

                                        Arthur N. Votolato
                                        U.S. Bankruptcy Judge

Entered on docket: 7/30/12

20